Joseph Peter Drennon v. Yusuf Abdi Ali As an initial housekeeping matter I'd like the court to note that I've reserved seven minutes for rebuttal.  Your Honors, we respectfully request that the Dishonorable Court reverse and remand the order denying my client's claim for common law immunity. And as a threshold issue with regard to that claim, I think it's important to note the current posture of the case insofar as the position of the United States is concerned. The District Court requested a statement of views from the United States. It has done so several times during the long pendency of this case. And the most recent statement from the executive branch in this case was filed in the District Court on April 24th of last year. And essentially the position of the government was that at that time it was considering the request of the sovereign government of Somalia for immunity for my client, but that it stymied in engaging in diplomatic discussions with Somalia because of the problematical security situation in that unfortunate, long-suffering country. Apparently that situation still obtains as there has been no formal grant or denial of the Somalia government's request for immunity. In that request for immunity, the United States noted that at that time... Are you going to argue their request for immunity or are you going to argue the case here today? Your Honor, all I'm saying is that that's an option that this Court has. It can defer a decision and request a position from the government. I think it would be well counseled to argue a case here today just before this Court. I understand, Your Honor. Essentially, we understand... I understand the position of the Court here. Your Honor, we also understand that a panel of this Court in 2012 essentially adopted an extraordinary, categorical, just cogent exception to common law immunity. And I was... As I understand your brief... Yes. Your Honor, you're not arguing, and if you do, tell us where, that any of the acts alleged against to have been committed by your client, you're not questioning whether those acts violate just cogent's norms. We're not questioning whether they violate just cogent's norms. Obviously, we're disputing... I have a declaration from my client is the facts here is that he denies that he engaged in the conduct alleged in the complaint. But to answer your Honor's question, yes, we're not disputing that those alleged acts would violate just cogent's norms, excepting... Why don't you tell us very specifically why your client's entitled to foreign official immunity? Well, he's certainly not the head of state, but he, at the time, was the commander of the brigade that was responsible for the security cordon in northern Somalia. And Mader v. Dictor, the Second Circuit case that takes an opposite position on just cogent's... I want to amend one thing I said about just cogent's norms, your Honor. We reject the notion that this court is an appropriate forum to adjudicate violation of just cogent's norms in a foreign country by a foreign official. But with regard to my client's status, no, he's not the head of state, but he was an official in the government in that he was a brigade commander in the Somali National Army. And so, therefore, we believe that he is entitled to common law immunity because he was acting within the scope of his duty as a brigade commander, and we reject the notion that the just cogent's supersede or override the laws of his country. Well, what precedent do you have that says that that position is viable? Position with regard to his official status or position with regard to the just cogent? Well, you've told us he's not a head of state. Not a head of state. He's not a member of the diplomatic corps. No. He's an officer in the military. He's an officer in the military. You're not contesting that there are allegations that acts that he's alleged to have committed violate the just cogent's norms, whatever they are. So, I'm not really very clear on how you get to the end result that your client prevails and the district court was wrong. Well, we don't have a story of decisiveness that's right on point on that issue. But we think that it's a logical extension of the type of recognition that was given to – Well, in fact, there's a case that's directly against your position on the issue, right, in our court. Pardon? Meaning the Samantar? Yes. Your Honor, I understand that there is a panel of this court that that is the law of this circuit. But under Dickerson, pressed in the Supreme Court 2000 case, I believe, a court can overturn its own precedent. And an argument can be made. Our position here is that Samantar was wrongly decided. And one might add that cert was denied, and therefore, even though there is discordance among the circuits, in fact, the majority of the circuits that have weighed in on this have weighed in against the position that this circuit has taken. Well, wouldn't that be a great argument for you to make in a petition for a re-hearing on Bonk for failing to be successful on that to tell a Supreme Court that there's now a circuit split and see if they wouldn't take the case? Well, that may very well be where we wind up on that point. Well, to Judge Diaz's point, we have this case. We were bound by that, absent some extraordinary circumstance like a following Supreme Court opinion. So what do we do? Well, let's address the issue of extraordinary circumstance. Respectfully, we think an extraordinary circumstance is that, to be sure, the Supreme Court denied cert twice. The Supreme Court also requested briefs from the Solicitor General, and the Solicitor General in both instances in Samantar rejected and took a position contrary to the position that the panel took in Samantar regarding the Just Cogents categorical exception. And to be sure, Samantar, judging as to why Supreme Courts don't take cert is like reading tea leaves or entree reading. But with that proviso in mind, Samantar was a case in which there was a default judgment entered against Samantar before the matter of immunity was even heard by or considered on the cert petition. So it's fair to say that perhaps that's the reason that the court considered Samantar not to be cert worthy. Moving on to address the ATS issue, Your Honor, I think that there's no gainsaying that there is absolutely no assertion whatsoever made by the plaintiff in his case that this case touches and concerns the United States, save the fact that my client just happens to live here. And respectfully, we are of the view that the district court correctly decided that aspect of its order, and we would ask that the court affirm that aspect of its decision. There being not any questions, I would just reserve the balance of my time for rebuttal. Thank you, Counsel. Thank you. Thank you, Your Honor. My name is Tara Lee, and I am on behalf of Farhan Warfa, who is the plaintiff, appellant, and cross appellee in this case. Mr. Warfa's cross appeal raises the question of the proper application of the Supreme Court's Kiobel decision to the facts of his case. The 2013 Kiobel opinion applied a presumption of extraterritoriality to the question of subject matter jurisdiction under the Alien Tort Statute. I want to begin with the premise that was recognized by this circuit in Al-Shamari. Kiobel did not announce a categorical bar on cases that are based on foreign conduct. Where the district court clearly erred here is to end that court's analysis at the question of extraterritorial conduct or not. The district court in our case held that the Alien Tort Statute may never reach conduct occurring in a territory of a foreign sovereign. Kiobel does not mandate or even direct a court to that conclusion. As Al-Shamari noted, when the Fourth Circuit interpreted the proper application of Kiobel, courts must look at a broader range of facts than just the location of injury. Even if the district court erred, as you say, in applying the Kiobel, the fact remains that we can look at the record and decide whether or not the facts support the ultimate outcome in this case. I think that's exactly right, Your Honor. All right. I think that's the crux of what you have to decide today. Do you remand it back and point out to the district court that they stopped short of the analysis, or do you look at the facts and allegations now? Okay, well, other than physical presence in the United States, what else is there to support the application of the statute? In the Al-Shamari case, of the five factors that the Al-Shamari court noted, that case had to do, first of all, with corporate presence and corporate activity. And I want to say at the outset, I think that analysis is different when you're dealing with individual defendants, natural persons. But in Al-Shamari, one of the factors the court looked at was the clearly stated U.S. national interest in having a cause of action for these kinds of offenses to be brought in the United States by foreign nationals. We have that same factor here, and I would argue that in these cases it weighs particularly heavily. I think the fact pattern is… Well, if you apply that across the border, it almost swallows the holding in Kiobel. It can't be the case that there's clearly a presumption against the application of the statute. There is. So what Kiobel directs is a presumption against extraterritoriality. And as Al-Shamari makes very clear, the analysis doesn't end there. You look for an aggregate of facts that do touch and concern the United States in that claim. Not in that conduct, but in that claim. And I think this is where a number of courts trying to interpret Kiobel have gone a bit wrong. Interestingly, I never would have thought this the first time I read Kiobel, but the first opinion I would point you to in Kiobel is actually Kennedy's, his solo concurrence. It's like a page long and offers very little insight of who he will be likely to join the next time it comes up. What he says to you is other cases will arise that require elaboration. And I think the quintessential cases that he was referring to and that the court notes in its opinion and in its concurrence that will come up later and need clarification are these safe harbor defendant cases. The defendant here is... Why would your case fit into this classification you described? So Mr. Ali in this case is what I think of as the quintessential safe harbor defendant. I don't think a court will get a better set of facts to look at this safe harbor defendant case. What do you mean by safe harbor? I mean... You just found him in the U.S.? In this case you have even more than his presence in the United States. You have a pleading allegation and a concession in the response to that from the defendant. He actually arrived in the United States in 1996, has been a permanent resident here for 20 years, and arrived here having been deported from Canada for the very human rights abuses in Somalia that are the subject of this claim. He sought safe harbor in this forum. And in so doing, he fits into a classification of defendant that follows the line of cases that began in 1980 with Dolly Filartiga's claim. So if he'd only been here for two years, would that be sufficient? Well in Filartiga's case, it was a matter of weeks that the safe harbor defendant had been present in the United States. Importantly, nothing in Kiobel has overturned the Filartiga line of cases. Your task is to find a way to read Kiobel's extraterritorial presumptions. I think that's your task to tell us what to do. I am here for you, and let me tell you how you can do it. We're listening. All right? So you've got to find a way to make them consistent. And I think that there's one clear way, and there's a lot of sources you can look at for guidance on how to do this. Al-Shamari is one of them, because it tells you to look at the claim itself to see if it touches and concerns the United States, not just the conduct that happens overseas. Because if that was the rule, if the rule was as a district court found, and as other district courts have found, that extraterritorial conduct by itself is a bar to the claims, then every single one of those Filartiga cases has been overturned. And we know that hasn't happened. In fact, in Kiobel, we have four justices say so in writing by citing the Filartiga case. Kennedy, as I mentioned, his one-page opinion that says we'll get to a lot of this later, doesn't say so. But in an oral argument, he stated definitively that Filartiga by name is binding and controlling precedent. If they had intended to overturn that line of cases, those safe harbor defendants, they would have. And I keep going to Filartiga because I think it's the quintessential safe harbor case. Filartiga brought her claims. But tell us, what's the limiting factor on this long string of consistency in Supreme Court cases that talks about the presumption against extraterritoriality? It doesn't sound like there's much if being here, being a president of the United States for a couple of weeks is sufficient. Well, the presumption against extraterritoriality is a really interesting starting point. Because when Kiobel chose it as the starting point, they were looking at the principles underlying that presumption and why you go there in the first place. Predominantly, and these are the ones that were also cited by the Al-Shammari Court, you look at whether there's going to be a clash of laws, and you look at whether you don't want unwarranted judicial interference. I would suggest that those two factors cut completely differently. If you're not looking at corporations and their mere corporate presence in multiple jurisdictions, but if instead you're looking at a natural defendant, a natural person defendant who has sought safe harbor in the United States, when you get to that category, you don't have a conflict of laws the way you have an unsettled set of laws about corporate liability internationally. You have pretty good international agreement on certain use, cogens, violations of international law. The chances of a conflict of laws are low. And importantly, and this gets me to the factor that I think is the dispositive touch and concern element in these safe harbor cases, on the other underpinning for the presumption against extraterritoriality, the idea that we are worried about unwarranted judicial interference, that is a non-concern for a safe harbor defendant because you have a repeated position of the United States government. Dating back to the statement of interest in the Philadelphia case in 1976 or 1980, I forget which, all the way through to the amicus brief that the U.S. government submitted in the Keogh case in 2013. You have a consistent and repeated statement that the U.S. has a national interest, a strong national interest in not becoming a safe harbor for the world's war criminals. Ms. Lee, you mentioned Philarkia and other cases that, as I recall, were all decided pre-Keogh Bill. Yes. The Second Circuit, since Philarkia, has taken a diametrically opposed position and said basically if a conduct occurs outside of the U.S., that's the end of the matter. So I don't know that relying on these cases is all that compelling. Well, here's why I think it is. Because I think the Fourth Circuit has it right where the Second Circuit has it wrong. I'm glad you think so. Not surprisingly. The Second Circuit stops entirely at that first prong of what is a two-prong analysis. It cannot be that the absence of domestic conduct bars the claims. If that's the case, then Philarkia is overturned and Marcos is overturned. And both of those cases are cited approvingly in SOSA by the U.S. Supreme Court in 2004. It's not like the Supreme Court doesn't know these cases are out there and that this precedent is out there and they choose not to overturn it. So we have to, I said we this time, we have to reconcile it. And the only logical way to do that is to go to what touches and concerns the United States. What part of the claim, not just the conduct, touches and concerns the United States. And there is such a clear statement by the United States that our foreign policy and national interest lies in not becoming a safe harbor for war criminals, that I think that gets you there. I think it has to, because if it doesn't, then Philarkia and Marcos and the rest of them, the ones cited approvingly in SOSA, the ones that the Supreme Court justices in Kiobel knew were out there and didn't overturn, would have to be wrong. There would have to have been an error in finding subject matter jurisdictions. Is your safe harbor analysis dependent on an assumption or some evidence that no other country has jurisdiction over this particular individual? Not necessarily, but that's one of the areas where because it's a natural defendant, the analysis comes out differently. One of the things that the Roberts majority opinion in Kiobel keyed on was that mere corporate presence is not enough. Mere corporate presence is so vastly different from where an individual natural person defendant has elected to take up residency. By choosing to purposely avail himself of the jurisdiction of the United States, the protection of the laws, the privileges of being a resident, he has purposely availed himself of the protection of the laws in the U.S. And repeatedly the United States government says... Wouldn't a corporation who has a presence also have availed itself of those same opportunities? To a much lesser degree, and here's the difference that goes to Judge Diaz's question. By doing so as an individual, you have limited the other jurisdictions that can haul you in. You have effectively self-selected where you're subject to the general jurisdiction of a personal jurisdiction issue. You limit yourself. Whereas corporations that appear in multiple jurisdictions aren't so limited. So I think that, to answer your question, is one of the ways that individual defendants just come out differently. The purposeful availment narrows the other ways, narrows the fora that are available to have accountability here. When courts have looked at this, in particular when Kiobel looked at this, it made a very narrow holding in a case that was dealing with corporate presence. All it held was that mere corporate presence in the U.S. is insufficient to displace the presumption. So you can send the case back to the district court and say, please analyze whether or not there's an aggregate of facts here relevant to this claim that displace the presumption or not.  and make what I think is going to be a very important ruling-giving direction, as Kennedy suggested would be necessary, elaborating on how we reconcile these cases. By saying that mere corporate presence alone is not enough and acknowledging that corporations are often present in multiple locations, the court said nothing about how you handle a safe harbor defendant, natural person, who is present by his own choosing in the United States when a claim is brought, charging him or asking him to be accountable for the human rights violations that he fled when he came here. Where this defendant chose to become a permanent resident of the United States in 1996 after being deported from Canada for human rights abuses in Somalia. He chose this forum, and this forum has subject matter jurisdiction over him because of the strong U.S. interest in not being that safe harbor. If this court were to now refuse to recognize that type of cause of action under those circumstances, it would actually set back the national interest, the often-stated national interest, in promoting human rights accountability. I did not invent that sentence. That comes from the U.S.'s statements of interest, from Philardega all the way through to Kiobel. It would also obviate the repeated and stated foreign policy interest of the United States that has been explicitly set forth in their amicus briefs and their statements of interest. And importantly, it would require a rejection of judicial precedent here that Kiobel did not sanction, did not encourage. The only way to read Kiobel consistently with Sosa, noting that Sosa cites favorably. In this case, the United States hasn't said anything. Now, declined three different times to weigh in on the immunity issues and has no statement of interest in the case. There is a statement of interest in the Samatar case. Samatar, in this case, were filed on the same day, have been progressing through the same district court. The statement of interest in the Samatar case includes that quote that I just read you that keeps showing up about the U.S.'s strong interest in not being a safe harbor. Well, doesn't that kind of cut against you then, that the U.S. has taken no position here? For immunity, the taking of a position is the critical turning point. For the purposes of understanding the U.S. interest in safe harbor, I think that has appeared so many different times that they can't be expected to have to say so, that the U.S. has an interest in not being a safe harbor for war criminals in every single individual case in order to trigger the recognition under the touch and concern test of the fact that a safe harbor defendant runs afoul of the U.S. interest in not becoming a safe harbor. It's different when you're in the immunity context and you're actually looking for them to affirmatively weigh in. Here, part of your task is to look at the whole claim, not just the conduct and where it occurred, but the whole claim. And the only way to read those cases consistently is to turn, as Alshamari did, to the stated U.S. national interest. And here, it shows up over and over again. Not just in case law, but in legislative hearings. There have been three, 2007, 2009, 2011, hearings entitled, No Safe Haven. That's the Congress weighing in, making clear their intent. You can look to the TVPA, a statute that came about after the Florida line of cases, to expand, not abrogate, the Florida cases. There's no judicial abrogation. There's no executive abrogation. And there's no legislative abrogation of that line of cases. And importantly, Kiobel doesn't mandate it either. I suppose the executive, if it felt as strongly as you did about no safe harbor, could take action against this individual, right? Well, it's interesting. In terms of what type of action, there are a number related to immigration status that they can and do. What they can do criminally is different, and there are statute of limitations. What we have in the United States is a mechanism for civil liability. And nobody in the executive, the judiciary, or the legislative branches have ever suggested that it's time for the United States to step up. Sure, I mean, it is a mechanism, but a mechanism that comes with it is attached a presumption against its use in most cases. And it seems to me that if that is true, that maybe it's appropriate to wait and see what the executive chooses to do or not. I don't think it can be the only consideration. I think courts are obligated to reconcile the precedent. And I think the only way to do that is to—here's what I think it comes down to a lot. When you're looking at jurisdiction and who you're going to haul in, it becomes a fairness discussion. I think in Kiobo, when the court applied this presumption against extraterritoriality, what they were really asking is should we really be hailing a foreign corporation into U.S. court for conduct committed abroad? They wrestled with that question. I think the safe harbor cases also come down to a fairness question. Should this defendant be allowed to voluntarily avail himself of the law, privileges, and protections of the law of the United States that come with his chosen permanent residency and simultaneously claim that his prior war crimes and human rights abuses don't touch and concern the United States while he lives here? I think the answer is no, and I ask you to so hold. Thank you. Thank you. Several points in rebuttal. Well, we're talking here about a 1789 statute, which doesn't say anything about safe harbor, and we respectfully, with all due respect to counsel's position here, we're very far afield of what the statute initially intended to accomplish. This was a statute that dealt with the safe passage of ambassadors and allowing a cause of action to help facilitate that. With regard to the assertion that my client was deported from Canada for civil rights abuses or human rights abuses in Somalia, there's nothing in the appendix, there's nothing in the record to establish that that was the reason that he was deported from Canada. He was deported from Canada. He came to the United States. Incidentally, he was deported from Canada after a television interview that embarrassed the immigration minister there. Because they had accepted him. That's why. They corrected him, unlike the United States. They deported him. Go ahead, counsel. You don't have much time. That wasn't a question. Go ahead. I understand, Your Honor, but Your Honor's point, though, addresses really what appears to be the government of counsel's position here. The plaintiff takes umbrage that my client actually lives here in the United States. Isn't that a matter that's more appropriately addressed by addressing the executive under the immigration laws of this country, rather than through this elongated process of trying to bootstrap? That is one way to address his presence here, but this is a way to address the question here, whether or not he should be civilly responsible for the brutal crime that occurred as alleged here. That's a different question here. He should be allowed to take the full protection of the United States as a permanent alien and avoid liability. That's the question. And deportation is another area. Well, but is the alien tort statute, which is the question presented here, the appropriate vehicle for doing so? And Kiobel essentially narrowed and delimited the application of the ATS. The ATS at one point had a cosmopolitan application in which it was basically a way for the United States to export its norms to conduct in foreign countries. And essentially that's what Kiobel curtailed. And the only opinion in the Supreme Court's decision in Kiobel that appears, the concurring opinion that appears to support counsel's position was Justice Breyer's opinion.  And the court appears in Kiobel to address these concerns that are raised by suggesting that there might be a more definitive statute. And there is not a statute here that explicitly creates jurisdiction for addressing these claims. And, of course, we vigorously object to the, disagree with the contention. Do you agree that following our circuit precedent, we have to look at more than just the location of the conduct? Well, I think you're obviously adverting to Al-Shamari. Al-Shamari, Your Honor. I thought it was rather direct, but go ahead. Well, Al-Shamari addressed all the relevant conduct, and that relevant conduct included a lot of conduct in the United States on the part of CACI, the government contractor that was being sued for human rights abuses in Iraq on the part of its contract employees. Here, there is no nexus to the United States. In fact, Virginia and the United States is out of the question until my client actually comes here. Was he trained by the United States when he trained at Keesner Air Force Base? He did receive training under the United States, but that's not alleged as being a basis for jurisdiction. Yes, he did receive training in the United States. He was trained by this country while he was in Somalia, wasn't he? Your Honor, during the 1980s, our country was an ally of Somalia, and many Somali military officials received training in the United States under a joint cooperation agreement. So that's another touch of the United States that you didn't mention. How does that – is there an allegation? It makes it worse, in my mind. In your mind, Your Honor, but in the law's mind, no. Well, my mind does count here a little, doesn't it? Yes, you are the judge. Yes, Your Honor. Thank you very much. I appreciate that. Yes, but, Your Honor, that's not the allegation that my client somehow learned – and that's a serious charge that my client learned how to torture people and was alleged in this complaint by the United States. He didn't. That's something that's beyond the pale. It's not even part of the complaint, and the allegations that we're dealing with are framed by the four corners of that complaint, and that is not an aspect of the allegations that are raised. The aspect of the – Well, counsel, you may be offended by it, but the fact of the matter remains that in Alshamari, part of the touching concern there was the contract that was entered into between the contractor and the U.S. government, and, of course, the end result of that contract may not have been anything that the parties contemplated. But Judge Gregory's point is that if you've got some prior relationship, in this case training, even as you say, it may not have directly resulted in training related to torture. That is a relevant part of the analysis, it seems to me. Well – Even if it's not – No, I understand the distinction that – Hold on a second. Hold on a second. All right. Let me finish, then you can speak. Okay? Even if it's not dispositive, it's something to consider. Would you agree? Perhaps. I see that my time is about to run out of the water clock here. I've got nine seconds left. Can I make one more point in that regard to answer this question, Your Honor? You may tell. And that is that picking up on Judge Gregory's point and Judge Diaz's point, to go down that road, as it were, would be a serious, respectfully, a serious transgression into the prerogatives of the executive because it would be having the judicial branch determine that my client, when he was a commander, a brigade commander in Somalia, was somehow in some agency role vis-à-vis the United States. And I just respectfully think that that is a specious point and that that really is an apposite with regard to the question of whether these claims touch and concern the United States. Thank you, Your Honor. Thank you. Ms. Lee, you have the rebuttal. Thank you. I just have a few premises to leave you with based on the questions that you're asking, Mr. Drennan. Kiobel didn't bar all claims that are based on extraterritorial conduct. Al-Shamari requires you to look at more than the location of the conduct. If that case asks correctly, does the claim touch and concern the U.S. sufficiently to displace that presumption? As part two of the analysis, you have to do. You could try to go through that analysis by remanding back to the district court to look for additional facts that tie you to domestic conduct, something happening inside the United States. I would urge you not to do that, and here's why. You don't have to. In order to reconcile the line of cases that has no domestic conduct in it but has been favorably upheld by the U.S. Supreme Court already and has never been abrogated or overturned or even distinguished by the U.S. Supreme Court, to reconcile those, you've got to be able to find it without this reach and stretch and look for a domestic connection. You can only reconcile those cases if you turn to the question of whether the claim touches and concerns the United States and you find that for a safe harbor defendant who's been a permanent resident for 20 years, availing himself of the privileges and protections of U.S. law, after leaving Canada deported for the human rights abuses that are the subject of this claim, he must be subject to U.S. law's jurisdiction. Thank you. Thank you. We will come to our Greek counsel.
judges: Roger L. Gregory, G. Steven Agee, Albert Diaz